UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 4:17cr52

MARTIN L. HUNT, et al.,

       Defendants.


OPINION AND ORDER

      This matter is before the Court on two defense motions seeking a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, ECF Nos. 734, 735, two motions seeking an evidentiary hearing, ECF Nos. 734, 737, and multiple associated "motions to adopt," ECF Nos. 739, 740, 741, 742, 744.  For the reasons set forth below, all Defendants' motions to adopt are **GRANTED**, and Defendants' new trial motions and motions seeking an evidentiary hearing are **DENIED**.[1]

## I. Background

      The seven Defendants seeking a new trial were all indicted on multiple felony charges associated with a RICO conspiracy

---

[1] Pro se defendant Geovanni Douglas filed a separate motion seeking a new trial on other grounds, ECF No. 681, two motions to "Set Aside Verdict," ECF Nos. 743, 745, as well as a filing construed by the Court as either an opposition brief, or motion for reconsideration, regarding a briefing extension granted to the Government in this case, ECF No. 749.  Douglas also recently filed a "reply brief" that focuses on his earlier motion for a new trial, not the pending motions being pursued by all seven Defendants.  ECF No. 752.  All of such motions/filings will be addressed by separate order.

involving an "enterprise" in Newport News, Virginia, known as the 36th Street Bang Squad ("36th Street").  On October 16, 2019, all seven Defendants proceeded to a trial by jury.  The trial concluded on December 10, 2019, with the jury returning a guilty verdict against all Defendants as to Count One – Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d).  With the exception of defendant Deshaun Richardson, all of the Defendants seeking a new trial were also convicted of additional "VICAR" racketeering crimes.[2]  All seven Defendants filed Rule 29 motions seeking to set aside the jury's verdicts, and all of such motions were previously denied by this Court.  After scheduling delays due to the COVID-19 pandemic, Defendants' in-person sentencing hearings were scheduled for the fall of this year; however, Defendants' sentencings were continued by the Court, at the request of the defense and over the Government's objections, so that Defendants could pursue new trials based on "newly discovered" evidence.  The relevant new evidence consists of two affidavits, one from a federal inmate who pled guilty to attempting, along with members/associates of 36th Street, to murder a rival gang member during an event that constituted one of the VICAR crimes covered

---

[2] Defendant Richardson was acquitted of two VICAR murder charges, and associated firearms charges, and convicted only of the RICO conspiracy.  Two other defendants, Martin Hunt and Xavier Greene, were convicted of multiple counts of VICAR murder, and associated firearm crimes, and face life sentences.  The remaining four Defendants were convicted of less serious VICAR crimes as well as associated firearms offenses.

at Defendants' trial (Quantavius Durham), and the other from a pre-trial detainee facing federal drug charges in an unrelated case (Jamar-Dominic Green).   ECF Nos. 734-1, 734-2.   Durham's affidavit, which is discussed in greater detail below in Part III.C, broadly alleges that multiple named and unnamed Government cooperators that testified at Defendants' trial purportedly admitted to a perjury conspiracy while together in a prisoner transport vehicle.   Green's affidavit alleges that one trial witness, Raquille Jackson, admitted that he, and others, committed perjury at Defendants' trial in order to obtain a sentence reduction.

## II. Standard of Review

A new trial motion is governed by Rule 33, which states that, upon receiving a timely motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).   The Fourth Circuit has adopted a five-part test governing new trial motions:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Robinson, 627 F.3d 941, 948 (4th Cir. 2010) (citation omitted); Mills v. United States, 281 F.2d 736, 738 (4th

Cir. 1960) (hereinafter, the "Mills test").   "Without ruling out the possibility that a rare example might exist, [the Fourth Circuit has] never allowed a new trial unless all five elements were established." Robinson, 627 F.3d at 948 (quotation marks and citation omitted).   Moreover, when newly discovered evidence "lack[s] credibility, it [is] not of such a nature that [it] would probably produce an acquittal in a new trial." United States v. Wilson, 624 F.3d 640, 665 (4th Cir. 2010) (internal quotation marks and citation omitted).

Notwithstanding the generally applicable Mills test, the Fourth Circuit has applied a modified test when the "newly discovered evidence" takes the form of a witness's recantation of trial testimony.   In such circumstances, the new trial motion "should be granted only if the court is 'reasonably well satisfied' (1) that the testimony given by a material witness was false; (2) the jury might have reached a different conclusion without the false evidence; and (3) the party seeking the new trial was surprised by the false testimony and was unable to meet it or did not know of its falsity until after trial." Wilson, 624 F.3d at 663-64 (citation omitted); United States v. Wallace, 528 F.2d 863, 866 (4th Cir. 1976) (hereinafter, "the Wallace test"). Importantly, a defendant's "failure to meet any one of the three prongs is fatal," and "[p]ost-trial recantations are looked upon

4

with the utmost suspicion." <u>Wilson</u>, 624 F.3d at 664 (internal quotation marks and citations omitted).

### III. Discussion

### A. The <u>Wallace</u> Test

It is critical to highlight at the outset of the <u>Wallace</u> analysis that there has been <u>no recantation</u> in this case by any testifying witness, rendering it unclear whether the <u>Wallace</u> test governs this case. <u>Cf.</u> <u>United States v. Maynard</u>, 77 F. App'x 183, 188 (4th Cir. 2003) (explaining that the <u>Wallace</u> test "is applied only when a witness recants trial testimony," and finding that "[n]o witness' testimony was recanted" in such case); <u>United States v. Clark</u>, 998 F.2d 1010, 1993 WL 264692, at *4 (4th Cir. 1993) (unpublished table opinion) (same); <u>United States v. Lofton</u>, 233 F.3d 313, 318 (4th Cir. 2000) (noting the "new evidence" was not a recantation, but did contradict a witness's trial testimony, ultimately finding that the Court "need not decide" whether the <u>Wallace</u> test was applicable because a new trial was not warranted under either <u>Wallace</u> or <u>Mills</u>); <u>United States v. King</u>, 232 F. Supp. 2d 636, 646-48 (E.D. Va. 2002) (finding, in a detailed opinion on this issue, that controlling case law does not strictly limit the <u>Wallace</u> test to "recantation" cases, and finding that such test was "the most appropriate test to apply" in a case where one witness recanted to counsel, and multiple other individuals testified that a witness who was the "centerpiece of the

prosecution's case" as to certain charges had committed perjury and encouraged them to do the same, rendering the true issue one of "false trial testimony" of material witnesses), aff'd, 71 F. App'x 192 (4th Cir. 2003).   While the facts of the instant case are distinguishable from the facts of United States v. King, this Court assumes, for the purposes of completeness, that the Wallace test applies.

The determination of whether to grant a new trial, and/or whether to hold an evidentiary hearing, is necessarily a case-specific inquiry that is based on multiple considerations, including the substance of the claimed "new" evidence and the evidence presented at trial, with the judge that presided over the trial in the best position to evaluate the latter consideration. The apparent benefit of the Wallace test to defendants is that a new trial may be granted under such standard if the Court is "reasonably well satisfied" that false testimony was given and that the jury "might" have reached a different verdict without the disputed evidence, a lower bar than the Mills test (which requires the Court to find that the jury "probably" would have returned a different verdict).

Here, for the reasons argued in detail by the Government, ECF No. 750, at 23-26, the Court finds that the case record reveals that Defendants fail to satisfy the first and second prongs of the Wallace test, as the two affidavits, both lacking in specificity,

6

leave the Court far from "reasonably well satisfied" that material testimony was false or that the jury "might" have reached a different verdict as a result of two individuals coming forward months after trial to claim that cooperating witnesses lied from the stand (essentially the same defense theory already advanced at trial).  At trial, the defense had the opportunity to, and did in fact, effectively litigate the defense theory that, in order to secure a sentence reduction, multiple witnesses had coordinated and/or falsified their stories to wrongly accuse Defendants of multiple violent crimes (to include murders that the defense suggested that cooperating witnesses had themselves committed). The Court, consistent with the split verdict from the jury, found some government cooperators very credible, some largely credible, and others less credible, at least with respect to certain subject matters.[3]  However, testimony that lacks some degree of credibility

---

[3] The jury seems to have made similar credibility determinations as it returned multiple "split verdicts," including acquitting defendant Richardson on multiple VICAR murder counts, and acquitting defendant Ryan Taybron on a charge of maintaining a drug involved premises.  Additionally, it appears that one trial witness, Jerrod Pemberton, was so effectively cross-examined by the defense that the Government moved to dismiss certain charges before the case went to the jury.  However, the fact that different witnesses had different recollections of certain events, and/or the fact that the defense was able to undercut portions of the Government's case (at least in the context of the "beyond a reasonable doubt" burden carried by the Government), does not suggest that any defendant was convicted in this case as a result of a conspiracy to commit perjury, and/or perjury itself as to any material fact.  Moreover, as highlighted by the Government, ECF No. 75, at 6-7, multiple cooperating witnesses (e.g., Sweetenburg, Atkins) were not in the transport vehicle referenced in Durham's affidavit, and multiple witnesses that testified against defendants were not even in custody at the time of trial (e.g., Atkins, Washington, and Belt).

does not mean that the testifying witness is wholly unreliable, and any testimony that is reasonably questioned is not examined in a vacuum, but is instead considered in conjunction with the other trial evidence, to include corroborating forensic testimony, Facebook records, the Government's presentation of how its investigation unfolded (including how and when certain facts were discovered or corroborated, see, e.g., Jackson Tr. 72), and the credible testimony of other witnesses with first-hand knowledge of the events in question.  Weighing the collective trial evidence against the minimally probative post-trial affidavits that do not identify a single case-specific fact that was falsified at trial, it is clear that Defendants fall far short of the showing necessary for the Court to have reasonable questions as to the veracity of the trial witnesses referenced in the affidavits and/or whether the jury might return a different verdict on any count on which a conviction was returned (there being a facially insufficiently showing of perjured testimony, there is no testimony to "exclude" when considering whether the verdict would be different absent such testimony).[4]

---

[4] The Court agrees with defense counsel's argument that, as to at least some counts, against some defendants, the instant case involved close questions that turned on witness credibility.  However, Defendants fail to demonstrate that any of their convictions were predicated solely, or even primarily, on the testimony of a witness who later recanted his or her testimony (either directly or indirectly).  To the contrary, Defendants have at best advanced the same theory pursued at trial, that most (if not all) of the government's cooperating witnesses were part of a far-reaching coordinated effort to wrongfully convict Defendants in order to secure sentence reductions.

Defendants further fail to demonstrate that the defense was "surprised" by the testimony presented at trial and/or that defense counsel or Defendants were "unaware" of the falsity of any material testimony they claim to be false, as required under the third prong of the Wallace test. Rather, it appears from the record that the material portions of the cooperators' trial testimony was "provided either to law enforcement agents or a federal grand jury long before the trial commenced." ECF No. 750, at 22. The defense fails to identify any cooperating witness that was not debriefed prior to trial and whose "FBI 302" interview record and/or grand jury testimony was not presented to the defense in advance of trial. Moreover, multiple in-custody witnesses were extensively cross-examined at trial regarding their truthfulness; their motive to receive a sentence reduction for cooperation; whether and how their story had changed over time from their initial interview, to their grand jury testimony, to trial; and the need for their story to "conform" with what the Government believed to be the "true" facts. Certain in-custody prosecution witnesses that were

---

Defendants do not present their post-trial attack, which is appropriately viewed with great skepticism, on a count by count basis, nor do they address corroborating Facebook records, forensic evidence, or testimony from individuals that were not being prosecuted as part of this case. After a two-month long complicated RICO trial, more is required to call into question the veracity of testifying witnesses and/or the integrity of the trial. Stated differently, if the defense called both "affidavit witnesses" to testify exactly as stated in their affidavits, the undersigned judge would not be "reasonably well satisfied" that any witness committed perjury as to a material fact.

purportedly part of the perjury conspiracy were further cross-examined about whether they were housed with other testifying in-custody witnesses, whether they were transported to the Courthouse with such witnesses, and whether they had talked with those other witnesses about their testimony.  Some lines of questioning merely hinted at a coordinated "conspiracy" among in-custody witnesses, while other lines of questioning more directly accused the witnesses of coordinating testimony to protect themselves.  See, e.g., Jackson Tr. at 117-18; Green Tr. 119-20, 138-42;[5] Ford Tr. 105-15.  Nothing in the post-trial briefing, therefore, suggests that Defendants were "surprised by the false testimony and w[ere] unable to meet it or did not know of its falsity until after trial."  Wilson, 624 F.3d at 664.  In light of the above, Defendants' motions for a new trial are **DENIED.**

## B. The Mills Test

To the extent that the Mills test is applicable, either exclusively, or in conjunction with the Wallace test, for the reasons argued in greater detail in the Government's opposition brief, ECF No. 750, at 18-21, the Court finds that a new trial is also not warranted, as the new out-of-court statements alleging conspiratorial coordination among certain in-custody witnesses,

---

[5] The cited trial transcript is testimony from co-defendant Jamaree Green, who pled guilty to conspiracy to commit murder and a firearm offense.  Such trial witness should not be confused with Jamar-Dominic Green, the person that submitted the post-trial affidavit, or Xavier Greene, one of the Defendants who proceeded to trial and is currently seeking a new trial.

and/or alleging that Jackson admitted to committing perjury, fails both the third prong (evidence must not be merely impeaching) and fifth prong (evidence would probably produce an acquittal) of the Mills test.  First, notwithstanding the analysis in King relied on by Defendants, the vague assertions of perjury in this case appear to be appropriately classified as "merely impeaching" due to their gross lack of specificity.  See Maynard, 77 F. App'x at 188 (rejecting a request for a remand for an evidentiary hearing, finding that the district court did not err in denying the motion for a new trial in a case where one or more post-trial affidavits presented new evidence claiming that a trial witness lied, labeling such new evidence as merely cumulative and impeaching).  As noted by the Government, were Defendants granted a new trial, the new evidence would be admissible only to rebut the testifying witness's sworn statements that they did not coordinate to tell lies about Defendants' conduct.[6]  Defendants' minimally probative "new evidence" sought to impeach the witnesses therefore fails the third prong of the Mills Test.[7]

---

[6] The cooperating witnesses named in the affidavits have not submitted responsive affidavits; however, their motive for testifying and their truthfulness were already addressed under oath at trial on direct and cross-examination.

[7] As discussed at length herein, this is also not one of the "narrow category" of cases where a defendant is convicted based on the uncorroborated testimony of a single witness, nor is it a case where the "new evidence" suggests that any trial witness was "utterly unworthy of being believed."  United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993) (citation omitted).

Second, consistent with the above discussion of the Wallace test, which has a more lenient standard for determining whether the outcome of trial would be different, Defendants fail to demonstrate that the sweeping allegations of a perjury conspiracy, or Jackson's purported admission to lying about unidentified facts, are "of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." Robinson, 627 F.3d at 948 (emphasis added). Here, Defendants have not offered a count by count recitation of the evidence in order to prove that any count for which the jury returned a guilty verdict turned on the veracity of a witness that later admitted to committing perjury as to a single material fact in this case,[8] and after a two-month complex RICO trial with dozens of witnesses, hundreds of physical exhibits, and thousands of pages of written

_____

[8] Defendant Richardson's reply brief seeks to highlight the "slim evidence presented against Mr. Richardson and distinguish his case from the other defendants." ECF No. 751, at 1. However, even if the Court assumes that Raquille Jackson lied about his contact with Richardson on the night of the double murder, Mr. Richardson was acquitted of such VICAR murder charges, and instead convicted of participation in the RICO conspiracy, apparently based on: (1) the testimony of Corey Sweetenburg (who is not alleged to have been present/connected to the "perjury admissions"); and (2) Richardson's own Facebook activity, to include activity on the same night as the double homicide. As discussed in this Court's Order denying Richardson's Rule 29 motion, ECF No. 713, at 10-16, such evidence revealed that Richardson, at a minimum, agreed with other enterprise members that individuals considered to be "rivals" of the 36th Street enterprise should and would be targeted for murder by other enterprise members. In light of the jury's split verdict, the "new evidence" does not undercut confidence in the outcome of trial, nor does it suggest that Richardson has any realistic chance of satisfying either the Wallace test or the Mills test even if the jury believed that Jackson testified falsely about Richardson. Stated differently, the Court's own evaluation of the credibility of the record evidence, to include Facebook records and Sweetenburg's testimony, supports the jury's verdict as to Count One.

evidence, to include corroborating forensic evidence and Facebook posts, far more is required to call into question the validity of the trial process and/or the reliability of the evidence the jury found sufficiently credible to convict on some, but not all, counts in this case.  This is especially so in a case where the guilty verdicts were predicated on the testimony of numerous witnesses, and the veracity of such witnesses, their incentive to lie, and the potential for coordinated testimony was amply explored on cross-examination.  See United States v. Yosuf, 508 F. Supp. 24, 26 (E.D. Va. 1980) ("Where the credibility of the chief prosecution witness has been thoroughly explored at the trial, or the defense has had ample opportunity to do so, appellate courts, absent suppression of evidence by the prosecution, consistently have upheld the trial court's decision denying a new trial." (citing cases)).  Defendants' motions for a new trial are therefore **DENIED** to the extent the Mills test controls.

## C. Evidentiary Hearing

The Court's finding that an evidentiary hearing is not called for in this case was made after considering numerous case-specific factors, including the lack of detail in the affidavits, the breadth of the Government's trial evidence, Defendants' failure to outline how the broad allegations of a perjury conspiracy—a theory of defense already raised at trial—undercut the weight of the evidence as to any of the counts of conviction, and the fact that

13

<u>not a single</u> trial witness has actually recanted his or her testimony (nor has any trial witness purportedly made a clear statement indicating that a specific defendant was actually convicted due to perjured testimony).

The Court's decision on this issue was also made after careful consideration of the "unending[] duty of the judiciary . . . to seek and to find the proper balance between the necessity for fair and just trials and the importance of finality of judgments." <u>Weaver v. Massachusetts</u>, 137 S. Ct. 1899, 1913 (2017); <u>cf.</u> 3 Fed. Prac. & Proc. Crim. § 583 (4th ed. Oct. 2020 update) (explaining that a motion for a new trial based on newly discovered evidence "is not favored by the courts and is viewed with great caution," because while "[n]o court wants a defendant to remain in jail once he discovers evidence showing that he is innocent, . . . after a defendant has had his day in court and has been fairly tried, courts are reluctant to give him a second trial and disrupt finality"). This Court, seeking to ensure that a fair and just trial was delivered, delayed the sentencings in this case over the Government's opposition in order to allow all parties involved to focus on the briefing/resolution of these pending issues, to include allowing sufficient time for counsel to pursue and submit any newly discovered evidence to the Court. Approximately one year has now passed since the conclusion of a complex two-month criminal jury trial, and the "new evidence" submitted by Defendants

is limited to two relatively short affidavits, which are each discussed in turn.

The first affidavit is from co-conspirator Quantavius Durham, who is serving a federal sentence for his participation in one of the VICAR crimes that was the subject of Defendants' trial.  Mr. Durham's affidavit vaguely states, under oath, that he overheard five named witnesses, and "others," stating during transport from Chesapeake City Jail to Northern Neck Regional Jail that they "conspired to lie about the defendants in order to get a reduction in sentence."  ECF No. 736-2.  Such affidavit does not state that any of the testifying witnesses admitted that he actually lied (as contrasted with conspiring to lie); does not state the subject of any inferred lies or indicate that such inferred lies were material; does not identify which witness purportedly lied; does not identify which facts testified to at trial were untrue; does not quote or paraphrase any actual "admission" to lying made by an individual in the transport vehicle; does not identify which of the prisoners made any presumed admission; does not identify which of the seven Defendants were wrongfully convicted based on any inferred lies; nor does it identify which counts of conviction the inferred lies were relevant to.  Accordingly, not only does the instant case not involve a witness seeking to recant his or her trial testimony, but the vague Durham affidavit arguably does not even constitute "recantation once removed" as it does not establish

that a testifying witness made a post-trial admission to a third-party that material trial testimony had been falsified. See King, 232 F. Supp. 2d at 646 (describing "recantation once removed" as a fact-pattern where a third party swears that a witness admitted to such third-party that his or her trial testimony was false). The sweeping assertions of a perjury conspiracy, even under oath, do little to move the needle in favor of Defendants, particularly when the affiant waited more than six months to come forward with such information after being present in the transport vehicle.[9] See 26 Moore's Federal Practice-Criminal Procedure § 633.05 (2020) (discussing recantation once removed, and indicating that a third party's affidavit swearing that a trial witness had "admitted to the third party that the witness's testimony was false . . . does not constitute material evidence," and would be "merely impeaching" if the third party testified at a new trial; therefore

---

[9] The Court notes, for context, that such affiant previously indicated in an unsworn letter mailed to this Court that: (1) he would testify to everything he said in his letter; and (2) one or more individuals in the transport vehicle also stated that they were "promised time cuts to falsify their statements." ECF No. 679 (emphasis added). Such allegation of a conspiracy in which prosecutors participated to suborn perjury is not supported by a shred of evidence in the record and, unsurprisingly, is not repeated in the affiant's subsequent affidavit. In fact, as discussed at length at trial, the Government's investigation in this case included challenging the veracity of certain cooperators and pursuing perjury charges against a witness that wrongfully claimed to be an eyewitness in this case. See, e.g., Ngbea Tr. 212-14. This Court's ruling does not rely on any unsworn statements in a letter; however, the inclusion of such fanciful allegation in the letter addressed to the "Chief Judge" of this Court along with a promise to testify to such fact may not be the only time this affiant has made questionable statements in conjunction with his involvement in this case. See ECF No. 750, at 8-9.

"the requisites of a successful [new trial] motion would not be satisfied").

The second, lengthier affidavit from Jamar-Dominic Green is more detailed in its allegations, but more limited in its scope, as it asserts that a single trial witness, Raquille Jackson, admitted to lying under oath, rendering such new evidence "recantation once removed." The affidavit goes on to allege facts constituting "recantation twice removed," or maybe more accurately labeled as "recantation once removed by proxy," as the affidavit, submitted by Green, alleges that Jackson admitted that both he (once-removed recantation), and "everyone else" (once-removed recantation as admitted by proxy), told lies from the stand. However, like the Durham affidavit, Green's sworn statement does not identify specific lies told at trial (or even the subject matter of purported lies), or to which defendant the lies pertained, other than Martin Hunt.[10]  The affidavit does, however,

---

[10] Defendant Martin Hunt is Jackson's half-brother, and Hunt is discussed in the Green affidavit.  Jackson's trial testimony as to Martin Hunt was certainly important to the Government's case; however, key parts of that testimony were corroborated by Hunt's own Facebook records and forensic evidence.  Additionally, as argued by the Government, other corroboration was also presented, to include an eyewitness at the scene of the double murder who identified Hunt as one of the shooters, and while Jackson's version of events on the night of the double murder may have changed over time, his testimony at trial was certainly not a "surprise" due to his prior testimony before the grand jury.  Moreover, Jackson did not have access to key corroborating information prior to his testimony, ECF No. 750, at 23-24, and Hunt's own Facebook records demonstrate that, shortly after the killings, Hunt was trying to sell his gun, but indicated on Facebook that a buyer did not want to be caught with Hunt's gun because it was "hot."  The affidavit, therefore, does not suggest the need for further inquiry as to defendant Hunt.

include other statements that provide further context for its interpretation, including the fact that: (1) the Government did not care who testified and that Green (who had no apparent connection to this case) could have testified and received a time cut if he wanted to; (2) the expressly stated purpose of the affidavit is to highlight that Green, who is awaiting his unrelated jury trial on drug trafficking charges, is "going through a similar situation" with multiple people lying about his case "just to get a time cut." ECF No. 736-1. Although Defendants seek to establish the absence of any known connection between the two affiants (Durham and Green), both submitted letters to this Court relatively close in time to each other, but not close in time to the event itself (the alleged perjury was first raised in a letter to the Court six to seven months after it was purportedly discovered by the affiant) and both affiants were apparently housed in the Northern Neck Regional Jail, at least for a time.

On these facts, which include: (1) the absence of any recanting witnesses that testified at trial; (2) the defense relying solely on "recantation once removed" and "recantation once removed by proxy"; (3) vague allegations in the affidavits, including a lack of detail regarding the specific out-of-court perjury admissions, the specifics of the claimed perjury, or the identity of the individuals that purportedly admitted that they committed perjury (other than Jackson); and (4) the consideration

of the quantum of trial evidence, to include corroborating evidence presented throughout the course of a seven-week trial, and the fact that the cooperators' truthfulness was already litigated at trial by vigorous cross-examination;[11] the Court finds that the finality of the full and fair trial process should prevail without the need for live testimony seeking to further expand prior attacks on the veracity of the trial witnesses.   See United States v. Bradshaw, 787 F.2d 1385, 1392 (10th Cir. 1986) (rejecting the claim that the district court "was required to conduct an evidentiary hearing" in a case where the new perjury "evidence" was conflicting affidavits executed by counsel that consisted of recantation "twice removed" originating from the defendant's co-defendant brother[12] and a "once removed" denial of recantation from the trial

---

[11] The jury was presented with the defense theory that the witnesses had coordinated their statements, as well as evidence that multiple witnesses' statements had changed over time, with various explanations given for such changes, including the witness initially lying to investigators to avoid getting in trouble.   Notably, the trial testimony given by different cooperating witnesses often did not "match-up" in coordinated fashion, including critical testimony regarding the identity of a shooter that actively took part in a double murder.   The post-trial affidavit from Durham indicates that "testifying witnesses" that admitted to the perjury conspiracy included both Raquille Jackson and Armani Branch, but these two individuals told starkly differing versions of the commission of the double murder, with Branch implicating Martin Hunt and Corey Sweetenburg (a key Government witnesses), and Sweetenburg implicating Hunt, Xavier Greene, and Richardson.   Richardson was acquitted of the double murder notwithstanding the testimony implicating him from Sweetenburg and Jackson, a decision likely grounded, at least in part, in Branch's conflicting testimony.

[12] Here, of course, the affidavit submitted by Durham comes from an "affiliate" of 36th Street who personally coordinated with 36th Street members to attempt to commit a retaliatory murder, and the affidavit from Green comes from an incarcerated individual expressly indicating his concern that he too is the victim of widespread perjury.   Cf. United States v. Bynum, 3 F.3d 769, 773 (4th Cir. 1993) ("Courts are justifiably leery of

witness, noting that "[a]fter considering the conflicting affidavits of counsel, and the absence of a recanting affidavit from [the trial witness himself], . . . the trial court acted within its discretion" by "refus[ing] to conduct a hearing and den[ying] the motion for new trial" (emphasis added)); United States v. Hamilton, 559 F.2d 1370, 1372-74 (5th Cir. 1977) (rejecting a challenge to the district court's failure to conduct an evidentiary hearing based primarily on allegations from inmates that met the key prosecution witnesses while incarcerated and purportedly heard such witnesses make statements indicating that their trial testimony would be falsified to "get a better deal," noting that the "acumen gained by [the] trial judge over the course of the proceedings made him well qualified to rule on the basis of affidavits without a hearing").

Just as motions for a new trial based on recanted testimony are viewed with extreme disfavor by courts in this circuit, motions for a new trial based on "recantation once removed" are even more suspect, particularly when advanced by a co-conspirator with an apparent motive to protect his convicted associates and/or by an individual with an expressly claimed motive of highlighting the unfairness in his own pending federal criminal case on the exact

---

post-trial statements by codefendants purporting to exonerate a cohort."). Moreover, as highlighted in the Government's brief, ECF No. 750, at 8-13, there are case-specific reasons to question the motive/veracity of both affiants, to include what appear to be multiple baseless attacks on counsel, the Government, and the Court.

same theory.[13]  See United States v. Johnson, 487 F.2d 1278, 1279 (4th Cir. 1973) ("Where a motion for a new trial is based upon recantation of testimony given at the trial, such recantation is looked upon with the utmost suspicion." (internal quotation marks and citation omitted)).  Indeed, it is appropriate for this Court to take notice of any "suspicious circumstances" surrounding a recantation, to include the timing of such recantation, id., although here, it must again be reiterated that there is no evidence of a "recantation" by any trial witness in this case.  It is likewise appropriate for this Court to draw "upon the knowledge and observations gained by having presided at the original trial," id., and here, there is not any "new evidence" causing the Court to suspect that any defendant was convicted of any count as a result of a trial witness participating in a conspiracy to commit perjury as has been alleged in the pending motions.  This Court, therefore, in its discretion, declines to conduct a post-trial evidentiary hearing.  See United States v. Smith, 62 F.3d 641, 651 (4th Cir. 1995) ("Just as the district court has broad discretion in resolving a new trial motion, so too does it enjoy discretion whether to hold an evidentiary hearing on the motion." (citation omitted)); U.S. ex rel. Davis v. U.S. Training Ctr. Inc., 498 F. App'x 308, 322 (4th Cir. 2012) (explaining, in a civil case, that

---

[13] Green's affidavit further indicates that it was submitted after media reports were published referencing witnesses purportedly lying from the stand at Defendants' trial.  ECF No. 734-2, at 2.

it is appropriate to give such a great degree of deference to trial judges addressing new trial motions and requests for expansion of the record "because the acumen gained by a trial judge over the course of the proceedings makes the court well qualified to rule on a motion for a new trial without an evidentiary hearing." (internal quotation marks and citation omitted)).  A contrary decision on this record would invite any inmate who comes into contact with a testifying cooperator to undercut the finality of the trial process many months or years after a jury returns a guilty verdict through nebulous assertions of unsworn hearsay "recantations" that lack any specifics associated with the witnesses' trial testimony, or the case in general.

In electing not to conduct a hearing, this Court found instructive a long-standing case from this District, United States v. Yosuf, 508 F. Supp. 24, 27 (E.D. Va. 1980).  In Yosuf, another judge of this Court denied the defendant's motion for a new trial predicated on three post-trial affidavits asserting that the Government's "principal witness" recanted after trial.  The district court carefully reviewed the witness's trial testimony, ultimately finding that the witness's credibility was "thoroughly explored and tested during the trial" and that "[e]very important element of her testimony was vigorously challenged at trial."  Id. at 30.  Moreover, while the testifying witness did not present a "counter affidavit" specifically denying the post-trial

22

allegations of two individuals claiming perjury, the Court concluded that "these affidavits are of <u>such a general nature</u> and are <u>so lacking in specifics</u> as to be <u>insignificant when compared to the record made at the trial</u>." <u>Id.</u> (emphasis added).[14] The Court denied the new trial motion on the papers, noting in a footnote that while a district court in Washington state had conducted an evidentiary hearing in a similar case, the appellate court's discussion in that case "clearly demonstrates that the trial court was not required to grant such hearing but, rather, that such motions are ordinarily decided solely upon affidavits." <u>Id.</u> at 27 n.1 (citing <u>United States v. Calacurcio</u>, 499 F.2d 1401, 1406 & n.7 (9th Cir. 1974)); <u>see</u> <u>Calacurcio</u>, 499 F.2d at 1406 & n.7 (classifying "recantation 'once removed'" as a "weak showing in support" of a new trial motion and noting that it "ordinarily" does not warrant a hearing); <u>see also</u> <u>Lyles v. United States</u>, 272 F.2d 910, 912 (5th Cir. 1959) ("Ordinarily the district court may in its discretion determine a motion for new trial upon affidavits without more.").

Here, the defense offered a consistent attack at trial on the veracity of the Government cooperators, to include suggestions/ allegations of coordinated testimony, and the jury rejected such

---

[14] The trial witness had previously executed a post-trial affidavit that "in effect" denied the allegations in <u>the third</u> more detailed affidavit submitted by the defendant in support of a new trial. <u>Yosuf</u>, 508 F. Supp. at 26.

challenges through their verdicts.  So too does this Court on the
record before it, without the need for further inquiry.  See United
States v. Slatten, 865 F.3d 767, 791 (D.C. Cir. 2017) ("A motion
for a new trial can ordinarily be decided . . . without an
evidentiary hearing.") (citation omitted) (omission in original);
United States v. Connolly, 504 F.3d 206, 220 (1st Cir. 2007) ("The
short of it is that evidentiary hearings on new trial motions in
criminal cases are the exception rather than the rule."); United
States v. Provost, 921 F.2d 163, 164 (8th Cir. 1990) ("Ordinarily,
a motion for a new trial based on new evidence may be decided
without a hearing resorting only to affidavits."); 3 Fed. Prac. &
Proc. Crim. § 583 (4th ed. Oct. 2020 update) (same).  While this
Court would likely view the need for an evidentiary hearing
differently if there were sworn recantation evidence from a trial
witness (as contrasted with recantation once removed), a hearing
is not called for in this case, nor is a hearing universally
required in cases where there is actual recantation evidence.  See
United States v. Roberts, 262 F.3d 286, 293-94 (4th Cir. 2001)
(affirming the denial of a new trial motion based on the district
court's reliance on its interpretation of the veracity of the
witness at trial as compared to a transcript of a "cryptic and
contradictory" recantation in which the witness "certainly did not
identify any facts to which he had testified falsely"); United
States v. Pearson, 203 F.3d 1243, 1274-75 (10th Cir. 2000) (noting

that, in some recantation cases, "the trial judge may be able to assess the credibility of the recantation without holding [an evidentiary] hearing"); Olson v. United States, 989 F.2d 229, 233 (7th Cir. 1993) (holding that "a court has broad discretion on whether to grant a hearing on a motion to introduce new evidence in the form of recantations," and indicating that "[a] hearing is particularly rare when the recantations consist of sworn affidavits by witnesses who testified at trial before the judge who is being asked to rehear the recanting witnesses," with a hearing appropriate when there are allegations of "jury tampering, prosecutorial misconduct, or third party confessions"). The motions seeking an evidentiary hearing are therefore **DENIED**.

## IV. Conclusion

For the reasons stated above, all of Defendants' motions to adopt are **GRANTED**, ECF Nos. 739, 740, 741, 742, 744. Defendants' collective motions for a new trial and for an evidentiary hearing are **DENIED**. ECF Nos. 734, 735, 737.

The Clerk is **DIRECTED** to forward a copy of this Order to counsel for Defendants, pro se defendant Geovanni Douglas, stand-by counsel for Mr. Douglas, and the United States Attorney's Office.

**IT IS SO ORDERED.**

/s/

_____
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
December __22__, 2020

26